UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| **ANGI SCHAVE**, | Court File No. _____ |
| Plaintiff, | |
| v. | **CLASS ACTION COMPLAINT** |
| **CENTRACARE HEALTH SYSTEM, THE BOARD OF DIRECTORS OF CENTRACARE HEALTH SYSTEM,** and **JOHN DOES 1–40,** | |
| Defendants. | |

Plaintiff, Angi Schave ("Plaintiff"), by and through her attorneys, on behalf of the CentraCare Health System 403(b) Plan, (the "403(b) Plan"), the CentraCare Health System 401(k) Plan (the "401(k) Plan"), (collectively, "the Plans")[1], herself, and all others similarly situated, states and alleges as follows:

1.      This is a putative class action brought pursuant to §§ 409 and 502 of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1109 and 1132, against the Plans' fiduciaries, which include CentraCare Health System ("CentraCare" or "Company") and the Board of Directors of CentraCare Health System and its members during the Class Period ("Board") for breaches of their fiduciary duties.

---

[1] The Plans are legal entities that can sue and be sued.  ERISA § 502(d)(1), 29 U.S.C. § 1132(d)(1). However, in a breach of fiduciary duty action such as this, the Plans are not a party.  Rather, pursuant to ERISA § 409, and the law interpreting it, the relief requested in this action is for the benefit of the Plans and their participants.

2.     ERISA imposes strict fiduciary duties of loyalty and prudence upon employers and other plan fiduciaries to further the public policy of safeguarding Plan assets and protecting participants' retirement investments. Fiduciaries must act "solely in the interest of the participants and beneficiaries," 29 U.S.C. § 1104(a)(1)(A), with the "care, skill, prudence, and diligence" that would be expected in managing a plan of similar scope. 29 U.S.C. § 1104(a)(1)(B). These dual fiduciary duties are "the highest known to the law." *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 595 (8th Cir. 2009) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)).

3.     The United States Department of Labor mandates that employers are held to a "high standard of care and diligence" and must, among other duties, both "establish a prudent process for selecting investment options and service providers" and "monitor investment options and service providers once selected to see that they continue to be appropriate choices." *See* U.S. Dep't of Labor: Emp. Benefits Sec. Admin., *A Look at 401(k) Plan Fees* 2 (Sept. 2019), available at https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/a-look-at-401k-plan-fees.pdf (last visited May 11, 2022) ("You should know that your employer also must consider the fees and expenses paid by your plan."); *see also Tibble v. Edison Int'l* (*Tibble I*), 575 U.S. 523, 530 (2015) (affirming the ongoing fiduciary duty to monitor a plan's investment options).

4.     Under 29 U.S.C. § 1104(a)(1), a plan fiduciary must consider the cost of investment options. "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are

obligated to minimize costs." Unif. Prudent Inv'r Act § 7 cmt. (Unif. Law Comm'n

1994) [hereinafter "UPIA"] (incorporating *Forward* to Restatement (Third) of Trusts:

Prudent Investor Rule (1992)). "The Restatement … instructs that 'cost-conscious

management is fundamental to prudence in the investment function,' and should be

applied 'not only in making investments but also in monitoring and reviewing

investments.'" *Tibble v. Edison Int'l* (*Tibble II*), 843 F.3d 1187, 1197–98 (9th Cir. 2016)

(*en banc*) (quoting Restatement (Third) of Trusts § 90, cmt. b).

5.     Additional fees of fractions of a percent can have a large effect on a

participant's investment results over time because "[b]eneficiaries subject to higher fees

… lose not only money spent on higher fees, but also lost investment opportunity; that

is, the money that the portion of their investment spent on unnecessary fees would have

earned over time." *Tibble II*, 843 F.3d at 1198 ("It is beyond dispute that the higher the

fees charged to a beneficiary, the more the beneficiary's investment shrinks.").

6.     The Supreme Court recently reiterated that interpreting "ERISA's duty

of prudence in light of the common law of trusts" a fiduciary "has a continuing duty of

some kind to monitor investments and remove imprudent ones" and a plaintiff may

allege that a fiduciary breached the duty of prudence by failing to properly monitor

investments and remove imprudent ones. *Hughes v. Northwestern Univ.*, 142 S. Ct. 737,

739 (2022).

7.     Prudent and impartial plan sponsors thus should be monitoring both the

performance and cost of the investments selected for their retirement plans, as well as

investigating alternatives in the marketplace to ensure that well-performing, low-cost investment options are being made available to plan participants.

8.     CentraCare sponsors two plans that are subject to ERISA's fiduciary duties.

9.     The 403(b) Plan is a defined contribution plan that became effective January 1, 1997. CentraCare froze the 403(b) Plan effective January 1, 2021. The Plan covers all employees of CentraCare Health System who have completed an hour of service. Affiliates, which are participating employers, include The Saint Cloud Hospital, Saint Benedict's Senior Community, CentraCare Health – Melrose, CentraCare Health – Long Prairie, CentraCare Clinic, CentraCare Health – Sauk Centre, CentraCare Health – Monticello, CentraCare Health – Paynesville, and Carris Health, LLC. At all times during the Class Period, the 403(b) Plan had at least $474 million dollars in assets under management. At the Plan's fiscal year end in 2020, the 403(b) Plan had over $927 million in assets under management that were or are entrusted to the care of the Plan's fiduciaries.

10.     The 401(k) Plan is a defined contribution plan, effective July 1, 2000, and amended and restated throughout the years. The 401(k) Plan covers all employees of CentraCare Health System who have completed one year of service and have attained the age 21. CentraCare permits affiliates' employees to participate in the Plan including: The Saint Cloud Hospital, St. Benedict's Senior Community, CentraCare Health Services of Melrose, CentraCare Health Services of Long Prairie, CentraCare Clinic, CentraCare Health Services of Sauk Centre, CentraCare Health Services of Monticello,

CentraCare Health Services of Paynesville, Affiliated Community Medical Centers, P.A., and Carris Health, LLC. At all times during the Class Period, the 401(k) Plan had at least $299 million dollars in assets under management. At the Plan's fiscal year end in 2020, the 401(k) Plan had over $785 million in assets under management that were or are entrusted to the care of the Plan's fiduciaries.

11.     Combined, the Plans have at least $1.7 billion in assets under management that were and are entrusted to the care of the Plan's fiduciaries.

12.     As large plans, the Plans had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to scrutinize each investment option that was offered in the Plan to ensure it was prudent.

13.     Plaintiff alleges that, during the putative Class Period, Defendants, as "fiduciaries" of the Plan, as that term is defined under ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, inter alia, (1) failing to objectively and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; (2) maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories; and (3) failing to control the Plans' recordkeeping costs.

14.      Defendants' mismanagement of the Plans, to the detriment of participants and beneficiaries, constitutes a breach of the fiduciary duty of prudence, in

violation of 29 U.S.C. § 1104. Their actions were contrary to actions of a reasonable fiduciary and cost the Plan and its participants millions of dollars.

15.    Based on this conduct, Plaintiff assert claims against Defendants for breach of the fiduciary duties of loyalty and prudence.

**PARTIES**

**I.    Plaintiff**

16.    Plaintiff, Angi Schave ("Schave"), resides in Sauk Rapids, Minnesota. During her employment, Plaintiff Schave participated in the 403(b) Plan and the 401(k) Plan, investing in the options offered by the Plans and which are the subject of this lawsuit.

17.    Plaintiff has standing to bring this action on behalf of the Plans because she participated in the Plans and was injured by Defendants' unlawful conduct. Plaintiff is entitled to receive benefits in the amount of the difference between the value of their accounts currently, or as of the time their accounts were distributed, and what their accounts are or would have been worth, but for Defendants' breaches of fiduciary duty as described herein.

18.    Plaintiff did not have knowledge of all material facts (including, among other things, the investment alternatives that are comparable to the investments offered within the Plans, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes) necessary to understand that Defendants breached their fiduciary duties and

6

engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

## II.     Defendants

### A.     Employer Defendant

19.     CentraCare is the sponsor and a named fiduciary of both Plans with a principal place of business being 1406 Sixth Ave N, St. Cloud, Minnesota. *See* CentraCare Health Sys., Annual Returns/Reports of Employee Benefit Plan (Form 5500) 1 (Feb. 22, 2022). The Company provides health care to people living in central Minnesota through a network of eight hospitals, thirty clinics, ten senior housing facilities, seven long-term care facilities, three pharmacies, and home care services.

20.     CentraCare determines the appropriateness of the Plans' investment offerings and monitors investment performance. CentraCare fell well short of these fiduciary standards.

21.     Accordingly, during the putative Class Period, CentraCare is and was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because it exercised discretionary authority over management or disposition of Plans.

22.     For the foregoing reasons, the Company is a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A).

### B.     Board Defendants

23.     CentraCare, acting through its Board of Directors, determines the appropriateness of the Plan's investment offerings and monitors investment

performance. As will be discussed below, the Board fell well short of these fiduciary standards.

24.     CentraCare, acting through its Board of Directors, also made discretionary decisions to make profit sharing and employer matching contributions to the 401(k) Plan each year. As detailed in its 2020 auditor's report, "[e]ach year, the Employer [CentraCare] may make a discretionary nonelective contribution to the Plan . . . . For the period ended December 31, 2020 and year ended June 30, 2020, the Employer contributed $17,937,239 and $35,771,407, respectively, to the Plan."

25.     Accordingly, the Board during the putative Class Period is and was a fiduciary of the Plans, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercised discretionary authority over management or disposition of Plan assets.

26.     Accordingly, each member of the Board during the putative Class Period (referred to herein as John Does 1–30) is/was a fiduciary of the Plan, within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) because each exercised discretionary authority over management or disposition of Plan assets.

27.     The Board and the unnamed members of the Board during the Class Period (referred to herein as John Does 1–30), are collectively referred to herein as the "Board Defendants."

**C.      Additional John Doe Defendants**

28.      To the extent that there are additional officers, employees and/or contractors of CentraCare who are/were fiduciaries of the Plan during the Class Period or were hired as an investment manager for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 1–40 include, but are not limited to, CentraCare officers, employees, and/or contractors who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A) during the Class Period.

## JURISDICTION & VENUE

29.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because it is a civil action arising under the laws of the United States, and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001, *et seq*.

30.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and/or have significant contacts with this District, and because ERISA provides for nationwide service of process.

31.      Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because some or all the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a

substantial part of the events or omissions giving rise to the claims asserted herein occurred within this District.

**FACTS**

### III.  The Plans

32.   CentraCare established the Plans to provide retirement income benefits to its employees and to provide such Employees with an opportunity to accumulate retirement savings on a tax deferred basis. As will be discussed below, the Plans have been hindered in fulfilling their purpose by the fiduciary breaches of both CentraCare and the Board.

33.   As noted above, CentraCare operates two Plans for the benefit of its employees. Both Plans serve the same purpose: a vehicle for retirement savings.

34.   The Plans are "defined contribution" or "individual account" plans within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34), in that the Plans provide for individual accounts for each participant and for benefits based solely upon the amount contributed to those accounts, and any income, expense, gains and losses, and any forfeitures of accounts of the participants which may be allocated to such participant's account. Consequently, retirement benefits provided by the Plans are based solely on the amounts allocated to each individual's account.

35.   In general, employees over the age of 21 are eligible to participate in the 401(k) Plan after their first year of employment. *See* CentraCare Health Sys., Annual Returns/Reports of Employee Benefit Plan (Form 5500) supp. at 5 (Feb. 22, 2022) [hereinafter the "2022 401(k) Auditor Report"]. The 2022 401(k) Auditor Report

10

provides that the Plan is a defined contribution plan sponsored by CentraCare Health System, covering substantially all employees of the Company and participating employers.

36.     CentraCare froze the 403(b) Plan in a plan amendment effective January 1, 2021. When an employer "freezes" a plan, it decides to cease all contributions but does not terminate the plan. A frozen plan requires full on-going compliance with the requirements of the final 403(b) regulations. Employees who participated in the 403(b) Plan are eligible for, and continue to participate in, the 401(k) Plan.

37.     In general, the 403(b) Plan covers employees over the age of 21 are eligible to after their first year of employment. *See* CentraCare Health Sys., Annual Return/Report of Employee Benefit Plan (Form 5500) supp. at 5 (Oct. 14, 2021) [hereinafter the "2022 403(b) Auditor Report"]. The 2020 403(b) Auditor Report provides that the Plan is a defined contribution plan sponsored by CentraCare Health System, covering substantially all employees of the Company and participating employers. *Id*.

38.     There are several types of contributions that could be added to a participant's 403(b) account including: a pre-tax employee salary deferral contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, discretionary nonelective contributions, and employer matching contributions based on contributions.  *Id.* With regard to employee contributions, eligible participants are permitted to elect to have a percentage of their compensation contributed as pre-tax 401(k) contributions or Roth deferral contributions

11

to the Plan. *Id.* Each year, until June 1, 2020, CentraCare made an Employer matching contribution to all eligible participants that have attained the age of 21, completed 2 years of service, and complete 500 hours of service in the Plan year for which the contribution is made. The matching contribution was equal to 50% of the participant's contribution, limited to the first 3% of compensation deferred. *Id.*

39.     Likewise, there are several types of contributions that could be added to a participant's 401(k) account including: a pre-tax employee salary deferral contribution, an employee after-tax contribution, catch-up contributions for employees aged 50 and over, rollover contributions, and employer matching contributions based on contributions. *See* 2022 401(k) Auditor Report at 5. With regard to employee contributions, eligible participants are permitted to elect to have a percentage of their compensation contributed as pre-tax 401(k) contributions or Roth deferral contributions to the Plan. Eligible new employees who fail to make a deferral election will be automatically enrolled to have their compensation reduced by 6% as a pre-tax contribution. Participants are allowed to change the automatic enrollment and elect a different percentage. Participants who have attained age 50 before the end of the Plan year are eligible to make catch-up contributions. *Id.*

40.     With regard to employer matching in the 401(k) Plan, effective April 15, 2019, CentraCare will make a matching contribution to all eligible participants that have attained the age of 21, completed 2 years of service, and completed 500 hours of service in the Plan year for which the contribution is made. The employer matching contribution

is equal to 50% of the participant's contribution, limited to the first 3% of compensation deferred. *Id.*

41.    With regard to CentraCare's discretionary contributions to the 401(k) Plan, the company may make a discretionary nonelective contribution to the Plan each year. The Employer nonelective contribution is allocated based on compensation subject to rate groups based on years of service. *Id.*

42.    Like other companies that sponsor 403(b) and 401(k) plans for their employees, CentraCare enjoys both direct and indirect benefits by providing matching contributions to Plan participants. Employers are generally permitted to take tax deductions for their contributions to 403(b) and 401(k) plans at the time when the contributions are made. *See generally 401(k) Plan Overview*, I.R.S., https://www.irs.gov/retirement- plans/plan-sponsor/401k-plan-overview (last updated Nov. 15, 2021).

43.    CentraCare also benefits in other ways from the Plan's matching program. It is well- known that "[o]ffering retirement plans can help in employers' efforts to attract new employees and reduce turnover." *See Employer Benefits of 401(k) Plans*, PAYCHEX (July 6, 2021), https://www.paychex.com/articles/employee-benefits/employer- matching-401k-benefits.

44.    Given the size of the Plans, CentraCare likely enjoyed a significant tax and cost savings from offering a match.

45.    In theory, CentraCare determines the appropriateness of the Plans' investment offerings and monitors investment performance. As will be discussed in more detail below, CentraCare and the Board fell well short of these fiduciary obligations.

46.    Several funds were available to Plans participants for investment each year during the putative Class Period. Specifically, a participant may direct all contributions to selected investments as made available and determined by CentraCare or the Board.

47.    During the Class Period, administrative expenses were paid using the Plans' assets. As described in the Auditor Reports: "Fees related to the general administration of the Plan are charged directly to the participant's account and included in administrative expense. Investment related expenses, including revenue sharing credits, are included in net appreciation (depreciation) of fair value of investments." 2022 403(b) Auditor Report at 5; 2022 401(k) Auditor Report at 8.

**IV. The Plans' Fees Were Unreasonable**

**A.    The Plan Fiduciaries Failed to Administer the Plan in a Prudent Manner.**

48.     As described in the "Parties" section above, Defendants were fiduciaries of the Plan.

49.    ERISA "imposes a 'prudent person' standard by which to measure fiduciaries' investment decisions and disposition of assets." *Fifth Third Bancorp v. Dudenhoeffer*, 134 S. Ct. 2459, 2467 (2014) (quotation omitted). In addition to a duty to select prudent investments, under ERISA, a fiduciary "has a continuing duty to monitor [plan] investments and remove imprudent ones" that exists "separate and apart from the

[fiduciary's] duty to exercise prudence in selecting investments." *Tibble I*, 575 U.S. at 529.

50.      Plaintiff did not have and does not have actual knowledge of the specifics of Defendants' decision-making process with respect to the Plan, including Defendants' processes (and execution of such) for selecting, monitoring, and removing Plan investments, because this information is solely within the possession of Defendants prior to discovery. *See Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("If Plaintiffs cannot state a claim without pleading facts which tend systematically to be in the sole possession of defendants, the remedial scheme of [ERISA] will fail, and the crucial rights secured by ERISA will suffer.") For purposes of this Complaint, Plaintiff has drawn reasonable inferences regarding these processes based upon the numerous factors set forth below.

51.      Defendants' breaches of their fiduciary duties, relating to their overall decision- making, resulted in *inter alia*, the selection (and maintenance) of several funds in the Plan throughout the Class Period, including those identified below, that wasted the assets of the Plan and the assets of participants because of unnecessary costs.

52.       Another indication of Defendants' failure to prudently monitor the Plan's funds is that several funds during the Class Period were more expensive than comparable funds found in similarly sized plans (conservatively, plans having between 250 million dollars and 500 million dollars in assets).

53.      In January 2012, the Department of Labor ("DOL") issued a final regulation under Section 408(b)(2) of ERISA which requires a "covered service provider"

to provide the responsible plan fiduciary with certain disclosures concerning fees and services provided to certain of their ERISA governed plans.  This regulation is commonly known as the service provider fee disclosure rule, often referred to as the "408(b)(2) Regulation."[10]

54.    The required disclosures must be furnished in advance of a plan fiduciary entering into or extending a contract or arrangement for covered services. The DOL has said that having this information will permit a plan fiduciary to make a more informed decision on whether to enter into or extend such contract or arrangement.

55.    As stated by the DOL, ERISA "requires plan fiduciaries, when selecting and monitoring service providers and plan investments, to act prudently and solely in the interest of the plan's participants and beneficiaries.  Responsible plan fiduciaries also must ensure that arrangements with their service providers are 'reasonable' and that only 'reasonable' compensation is paid for services.  Fundamental to the ability of fiduciaries to discharge these obligations is obtaining information sufficient to enable them to make informed decisions about an employee benefit plan's services, the costs of such services, and the service providers." *Fact Sheet: Final Regulation Relating to Service Provider Disclosures Under Section 408(b)(2)*, Dep't of Labor: Empl. Benefits Sec. Admin. at 1 (Feb. 2012) [hereinafter "DOL 408(b)(2) Regulation Fact Sheet"], https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/fact-sheets/final-regulation-service-provider-disclosures-under-408b2.pdf.

**B.      Several of the Plan's Funds Were Not in the Lowest Fee Share Class Available to the Plan**

56.      Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. There is no difference between share classes other than cost—the funds hold identical investments and have the same manager.

57.      A prudent fiduciary would immediately know to use the lowest cost available share class in a plan.

58.      Generally, more expensive share classes are targeted at smaller investors with less bargaining power, while lower cost shares are targeted at institutional investors with more assets. Qualifying for lower share classes usually requires only a minimum of a million dollars for individual funds.  However, it is common knowledge that investment minimums are often waived for large plans like the Plans. *See, e.g., Davis et al. v. Washington Univ. et al.*, 960 F.3d 478, 483 (8th Cir. 2020) ("minimum investment requirements are 'routinely waived' for individual investors in large retirement-savings plans"); *Sweda v. Univ. of Pennsylvania,* 923 F.3d 320, 329 (3d Cir. 2019) (citing *Tibble II*, 729 F.3d at 1137 n.24) (confirming that investment minimums are typically waived for large plans).

59.      Simply put, a fiduciary to a large defined contribution plan such as the Plans can use their asset size and negotiating power to invest in the cheapest share class available.

60.     The total assets under management for all of these funds was over 1.9 billion dollars, thus easily qualifying them for lower share classes.  The following chart provides detail on J.P. Morgan target date retirement funds:

| Fund in the Plans | Plan Share Class | Expense Ratio | Less Expensive Share Class | Lower Expense Ratio | Excess Cost |
|---|---|---|---|---|---|
| **2016** | | | | | |
| JPMorgan SmartRetirement Income | I | 0.64% | R6 | 0.51% | 0.13% |
| JPMorgan SmartRetirement 2020 | I | 0.69% | R6 | 0.54% | 0.15% |
| JPMorgan SmartRetirement 2025 | I | 0.71% | R6 | 0.57% | 0.14% |
| JPMorgan SmartRetirement 2030 A | I | 0.74% | R6 | 0.59% | 0.15% |
| JPMorgan SmartRetirement 2035 | I | 0.78% | R6 | 0.62% | 0.16% |
| JPMorgan SmartRetirement 2040 | I | 0.78% | R6 | 0.65% | 0.13% |
| JPMorgan SmartRetirement 2045 | I | 0.79% | R6 | 0.67% | 0.12% |
| JPMorgan SmartRetirement 2050 | I | 0.80% | R6 | 0.69% | 0.11% |
| JPMorgan SmartRetirement 2055 | I | 0.80% | R6 | 0.71% | 0.09% |
| **2017** | | | | | |
| JPMorgan SmartRetirement Income | R5 | 0.61% | R6 | 0.51% | 0.13% |
| JPMorgan SmartRetirement 2020 | R5 | 0.64% | R6 | 0.54% | 0.15% |
| JPMorgan SmartRetirement 2025 | R5 | 0.67% | R6 | 0.57% | 0.14% |

| Fund in the Plans | Plan Share Class | Expense Ratio | Less Expensive Share Class | Lower Expense Ratio | Excess Cost |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2030 A | R5 | 0.69% | R6 | 0.59% | 0.15% |
| JPMorgan SmartRetirement 2035 | R5 | 0.72% | R6 | 0.62% | 0.16% |
| JPMorgan SmartRetirement 2040 | R5 | 0.75% | R6 | 0.65% | 0.13% |
| JPMorgan SmartRetirement 2045 | R5 | 0.77% | R6 | 0.67% | 0.12% |
| JPMorgan SmartRetirement 2050 | R5 | 0.79% | R6 | 0.69% | 0.11% |
| JPMorgan SmartRetirement 2055 | R5 | 0.81% | R6 | 0.71% | 0.09% |
| **2018** | | | | | |
| JPMorgan SmartRetirement Income | R5 | 0.55% | R6 | 0.45% | 0.13% |
| JPMorgan SmartRetirement 2020 | R5 | 0.57% | R6 | 0.47% | 0.15% |
| JPMorgan SmartRetirement 2025 | R5 | 0.57% | R6 | 0.47% | 0.14% |
| JPMorgan SmartRetirement 2030 A | R5 | 0.60% | R6 | 0.50% | 0.15% |
| JPMorgan SmartRetirement 2035 | R5 | 0.60% | R6 | 0.50% | .16% |
| JPMorgan SmartRetirement 2040 | R5 | 0.61% | R6 | 0.51% | 0.13% |
| JPMorgan SmartRetirement 2045 | R5 | 0.61% | R6 | 0.51% | .12% |
| JPMorgan SmartRetirement 2050 | R5 | 0.61% | R6 | 0.51% | 0.11% |
| JPMorgan SmartRetirement 2055 | R5 | 0.64% | R6 | 0.54% | 0.09% |

| Fund in the Plans | Plan Share Class | Expense Ratio | Less Expensive Share Class | Lower Expense Ratio | Excess Cost |
|---|---|---|---|---|---|
| **2019** | | | | | |
| JPMorgan SmartRetirement Income | R5 | 0.55% | R6 | 0.45% | 0.13% |
| JPMorgan SmartRetirement 2020 | R5 | 0.57% | R6 | 0.47% | 0.15% |
| JPMorgan SmartRetirement 2025 | R5 | 0.58% | R6 | 0.48% | 0.14% |
| JPMorgan SmartRetirement 2030 A | R5 | 0.59% | R6 | 0.49% | 0.15% |
| JPMorgan SmartRetirement 2035 | R5 | 0.60% | R6 | 0.50% | 0.16% |
| JPMorgan SmartRetirement 2040 | R5 | 0.61% | R6 | 0.51% | 0.13% |
| JPMorgan SmartRetirement 2045 | R5 | 0.61% | R6 | 0.51% | 0.12% |
| JPMorgan SmartRetirement 2050 | R5 | 0.62% | R6 | 0.52% | 0.11% |
| JPMorgan SmartRetirement 2055 | R5 | 0.63% | R6 | 0.53% | 0.09% |
| JPMorgan SmartRetirement 2060 | R5 | 1.28% | R6 | 1.18% | 0.10% |
| **2020** | | | | | |
| JPMorgan SmartRetirement Income | R5 | 0.55% | R6 | 0.45% | 0.13% |
| JPMorgan SmartRetirement 2020 | R5 | 0.55% | R6 | 0.45% | 0.15% |
| JPMorgan SmartRetirement 2025 | R5 | 0.56% | R6 | 0.46% | 0.14% |
| JPMorgan SmartRetirement 2030 A | R5 | 0.57% | R6 | 0.47% | 0.15% |

| Fund in the Plans | Plan Share Class | Expense Ratio | Less Expensive Share Class | Lower Expense Ratio | Excess Cost |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2035 | R5 | 0.57% | R6 | 0.47% | 0.16% |
| JPMorgan SmartRetirement 2040 | R5 | 0.59% | R6 | 0.49% | 0.13% |
| JPMorgan SmartRetirement 2045 | R5 | 0.59% | R6 | 0.49% | 0.12% |
| JPMorgan SmartRetirement 2050 | R5 | 0.59% | R6 | 0.49% | 0.11% |
| JPMorgan SmartRetirement 2055 | R5 | 0.60% | R6 | 0.50% | 0.09% |
| JPMorgan SmartRetirement 2060 | R5 | 0.69% | R6 | 0.59% | 0.10% |
| **2021** | | | | | |
| JPMorgan SmartRetirement Income | R5 | 0.52% | R6 | 0.42% | 0.13% |
| JPMorgan SmartRetirement 2020 | R5 | 0.51% | R6 | 0.41% | 0.15% |
| JPMorgan SmartRetirement 2025 | R5 | 0.52% | R6 | 0.42% | 0.14% |
| JPMorgan SmartRetirement 2030 A | R5 | 0.53% | R6 | 0.43% | 0.15% |
| JPMorgan SmartRetirement 2035 | R5 | 0.55% | R6 | 0.45% | 0.16% |
| JPMorgan SmartRetirement 2040 | R5 | 0.56% | R6 | 0.46% | 0.13% |
| JPMorgan SmartRetirement 2045 | R5 | 0.57% | R6 | 0.47% | 0.12% |
| JPMorgan SmartRetirement 2050 | R5 | 0.57% | R6 | 0.47% | 0.11% |
| JPMorgan SmartRetirement 2055 | R5 | 0.58% | R6 | 0.48% | 0.09% |

| Fund in the Plans | Plan Share Class | Expense Ratio | Less Expensive Share Class | Lower Expense Ratio | Excess Cost |
|---|---|---|---|---|---|
| JPMorgan SmartRetirement 2060 | R5 | 0.62% | R6 | 0.52% | 0.10% |

61.     The Plans suffer from share class violations in other funds as well. For example, share class violations in the Plans' Fidelity funds create excess costs in the range of .10%–.29%.

62.     At all times during the Class Period, Defendants knew or should have known of the existence of identical less expensive share classes and therefore also should have immediately identified the prudence of transferring the Plans' funds into these alternative investments.

63.     There is no good-faith explanation for utilizing high-cost share classes when lower-cost share classes are available for the exact same investment.  Because the more expensive share classes chosen by Defendants were the same in every respect other than price to their less expensive counterparts, the more expensive share class funds could not have (1) a potential for higher return, (2) lower financial risk, (3) more services offered, (4) or greater management flexibility.  In short, the Plans did not receive any additional services or benefits based on its use of more expensive share classes; the only consequence was higher costs and lower year-over-year returns for Plans participants.

64.     Indeed, "[b]ecause the institutional share classes are otherwise *identical* to the Investor share classes, but with lower fees, a prudent fiduciary would know

immediately that a switch is necessary. Thus, the 'manner that is reasonable and appropriate to the particular investment action, and strategies involved … in this case would mandate a prudent fiduciary—who indisputably has knowledge of institutional share classes and that such share classes provide identical investments at lower costs—to switch share classes immediately." *Tibble, et al. v. Edison Int. et al.*, No. 07-5359, 2017 WL 3523737, at *13 (C.D. Cal. Aug. 16, 2017).

65.     Here, had the Plans' fiduciaries prudently undertaken their fiduciary responsibility for determining the appropriateness of the Plans' investment offerings and monitoring investment performance, the Plans would have moved to the identical lower cost share class of the identical fund.

66.     In fact, had the Plans' fiduciaries undertaken their fiduciary responsibility, they would have learned that the Securities and Exchange Commission filed charges against JP Morgan Securities LLC—the provider of the Plans' target date funds—alleging that it failed to provide certain customers with sales charge waivers and lower fee share classes when selling certain mutual funds to them. *See* J.P. Morgan Secs. LLC, Securities Act Release No. 10741, Exchange Act Release No. 87919, Investment Advisers Act Release No. 5429, 2020 WL 108470 (Jan. 9, 2020); *see also SEC Charges J.P. Morgan Securities for Disclosure Failures Related to Retirement and Charitable Customers*, U.S. Secs. & Exchange Comm'n (Jan. 9, 2020), https://www.sec.gov/enforce/33-10741-s. Despite the public nature of the charges, the SEC Order finding JPMS violated the Securities Act of 1933, and subsequent

settlement, Defendants failed to move the Plans' assets to the identical lower cost share classes.

**D.    Many of the Plans' Funds Charged Excessive Management Fees.**

67.    Investment options have a fee for investment management and other services. Like any other investor, retirement plan participants pay for these costs via the fund's expense ratio stated as a percentage of assets invested in the fund. For example, an expense ratio of 0.75% means that the plan participant will pay $7.50 in management fees annually for every $1,000 in assets.

68.    The expense ratio reduces the participant's return and the compounding effect of that return because it is paid out of the assets invested in the plan. Expense ratios in retirement accounts are particularly undesirable because the fees are paid using tax advantaged money. Therefore, it is prudent for a plan fiduciary to consider the effect that expense ratios have on investment returns because it is in the best interest of participants to do so.

69.    For purposes of evaluating expense ratios of an investment, plan fiduciaries should obtain competitive pricing information (*i.e.*, fees charged by other comparable investment funds to similarly situated plans). This type of information can be obtained through mutual fund data services, such as Morningstar, or with the assistance of the plan's expert consultant.

70.    For comparator information to be relevant for fiduciary purposes, it must be consistent with the size of the plan and its relative bargaining power. Large plans, for

instance, are able to qualify for lower fees on a per participant basis, and comparators should reflect this fact.

71.     Here, the Defendants could not have engaged in a prudent process as it relates to evaluating investment management fees.

**E.     Several of the Funds in the Plan had Lower Cost Better Performing Alternatives in the Same Investment Style**

72.     The Plans failed to replace several of the higher cost and underperforming funds which in 2020 housed over 1.19 billion dollars in participant assets. These funds had nearly identical lower cost alternatives during the Class Period. These funds are what's known as actively managed funds. An actively managed investment fund is a fund in which a manager or a management team makes decisions about how to invest the fund's money. Thus, the success or failure of an actively managed fund is linked directly to the abilities of the managers involved, this an additional risk factor called management risk.

73.     Here, the performance of the managers of these funds fell well short of acceptable industry standards and they should have been replaced at the beginning of the Class Period or sooner. Failure to do so cost the Plans and their participants millions of dollars in lost opportunity and revenue.

74.     There were, at least, hundreds of superior performing less expensive alternatives available during the Class Period one of which should have been selected by the Plan.

75.     The chart below choses one of these superior performing alternatives out of the many available for each fund and compares them to the underperforming funds currently in the Plans:

| Fund in the Plans | Plan Fund Fees | Alternative Fund | Alternative Fees | Excessive Fees Per Year |
|---|---|---|---|---|
| Fidelity Balanced | 0.51% | Fidelity Spartan 500 Index | 0.015% | -0.50% |
| Fidelity Small Cap Discovery | 0.62% | Fidelity Small Cap Index | 0.03% | -0.60% |
| JHancock Disciplined Value R6 | 0.72% | Vanguard Value Index | 0.04% | -0.68% |
| William Blair Small-Mid Cap Growth N | 1.16% | Vanguard Mid-Cap Growth Index Adm | 0.07% | -1.09% |
| JPMorgan SmartRetirement Income | 0.52% | State StreetTarget k 2020 Index | 0.09% | 0.43% |
| JPMorgan SmartRetirement 2020 | 0.51% | State StreetTarget k 2020 Index | 0.09% | 0.42% |
| JPMorgan SmartRetirement 2025 | 0.52% | State StreetTarget k 2025 Index | 0.09% | 0.43% |
| JPMorgan SmartRetirement 2030 A | 0.53% | State StreetTarget k 2030 Index | 0.09% | 0.44% |
| JPMorgan SmartRetirement 2035 | 0.55% | State StreetTarget k 2035 Index | 0.09% | 0.46% |
| JPMorgan SmartRetirement 2040 | 0.56% | State StreetTarget k 2040 Index | 0.09% | 0.47% |
| JPMorgan SmartRetirement 2045 | 0.57% | State StreetTarget k 2045 Index | 0.09% | 0.48% |
| JPMorgan SmartRetirement 2050 | 0.57% | State StreetTarget k 2050 Index | 0.09% | 0.48% |
| JPMorgan SmartRetirement 2055 | 0.58% | State StreetTarget k 2055 Index | 0.09% | 0.49% |
| JPMorgan SmartRetirement 2060 | 0.62% | State StreetTarget k 2060 Index | 0.09% | 0.53% |

| Fund in the Plans | Plan Fund Fees | Alternative Fund | Alternative Fees | Excessive Fees Per Year |
|---|---|---|---|---|
| JPMorgan SmartRetirement Income | 0.52% | State StreetTarget k 2020 Index | 0.09% | 0.43% |

76.    Not only are the fees excessive as compared to the similar lower cost alternatives discussed above but the suggested alternative funds outperformed all of the funds significantly. The difference between the excessive fees paid for these underperforming funds and the suggested alternatives represent more lost savings each year for plan participants and have been compounded over the years.   The underperformance of these funds as compared to the suggested alternatives increases these damages exponentially. The underperformance of these funds is represented in the chart below on a 5-year performance annualized basis as of December 31, 2021:

| Fund in the Plans | Plan Fund Performance | Alternative Fund | Alternative Performance | Plan Fund Underperformance Per Year |
|---|---|---|---|---|
| Fidelity Balanced | 15.03% | Fidelity Spartan 500 Index | 18.46% | -3.43% |
| Fidelity Small Cap Discovery | 11.43% | Fidelity Small Cap Index | 12.11% | -0.68% |
| JHancock Disciplined Value R6 | 11.94% | Vanguard Value Index | 12.52% | -0.58% |
| William Blair Small-Mid Cap Growth N | 18.55% | Vanguard Mid-Cap Growth Index Adm | 20.05% | -1.50% |
| JPMorgan SmartRetirement Income | 7.15% | State StreetTarget k 2020 Index | 9.34% | -2.19% |
| JPMorgan SmartRetirement 2020 | 7.89% | State StreetTarget k 2020 Index | 9.34% | -1.45% |
| JPMorgan SmartRetirement 2025 | 9.35% | State StreetTarget k 2025 Index | 11.10% | -1.75% |
| JPMorgan SmartRetirement 2030 A | 10.60% | State StreetTarget k 2030 Index | 12.17% | -1.57% |

| Fund in the Plans | Plan Fund Performance | Alternative Fund | Alternative Performance | Plan Fund Underperformance Per Year |
|---|---|---|---|---|
| JPMorgan SmartRetirement 2035 | 11.89% | State StreetTarget k 2035 Index | 12.82% | -0.93% |
| JPMorgan SmartRetirement 2040 | 11.64% | State StreetTarget k 2040 Index | 12.44% | -0.80% |
| JPMorgan SmartRetirement 2045 | 13.31% | State StreetTarget k 2045 Index | 13.76% | -0.45% |
| JPMorgan SmartRetirement 2050 | 13.30% | State StreetTarget k 2050 Index | 13.96% | -0.66% |
| JPMorgan SmartRetirement 2055 | 13.31% | State StreetTarget k 2055 Index | 13.98% | -0.67% |
| JPMorgan SmartRetirement 2060 | 13.30% | State StreetTarget k 2060 Index | 13.93% | -0.63% |
| JPMorgan SmartRetirement Income | 7.15% | State StreetTarget k 2020 Index | 9.34% | -2.19% |
| JPMorgan SmartRetirement 2020 | 7.89% | State StreetTarget k 2020 Index | 9.34% | -1.45% |
| JPMorgan SmartRetirement 2025 | 9.35% | State StreetTarget k 2025 Index | 11.10% | -1.75% |

77.     As detailed in the chart above, the comparator funds in the chart easily outperformed the funds in the Plans over five years. A prudent fiduciary should have been aware of these better preforming lower cost alternative and switched to them at the beginning of the Class Period.  Failure to do so is a clear indication that the Plan lacked any prudent process whatsoever for monitoring the cost and performance of the funds in the Plans.

### F.    Improper Revenue Sharing

78.    Revenue sharing is the practice of adding additional non-investment related fees to the expense ratio of a mutual fund. These additional fees are then paid out to various service providers—usually unrelated to the fund company managing the fund.

79.    Mutual fund returns are reported net of fees, so the money collected from investors and paid out to other parties is not explicitly reported to investors, it simply reduces the net investment return of the fund. Because investors do not see the fees being deducted, the true cost of the fees charged is often overlooked when calculating the total cost of plan services.

80.    In revenue sharing arrangements, the plan and the funds agree upon an asset-based fee (the expense ratio) that is not the true price for which the fund will provide its service.

81.    Instead, the agreed asset-based fee includes both the actual price for which the fund will provide its service *and* additional amounts that the fund does not need to cover the cost of its services and to make a profit.

82.    The additional portion of the agreed-upon expense ratio is "shared" with plan service providers or others who do business with the plan or the fund.

83.    To reduce or eliminate hard dollar payments altogether, a plan's fiduciaries or service provider may agree to set a fund's expense ratio at a level high enough to provide excess revenue sharing more than sufficient to cover all other plan services and more. This causes the pan's record keeping fees to appear deceptively low in disclosures to plan participants and government regulators.

84.     Revenue sharing is not always captured and used for the benefit of the plan and the participants.

85.     Plan fiduciaries may limit their selection of funds to only those funds which provide sufficient revenue sharing, thus foregoing superior investment alternatives and selecting or maintaining inferior investment option based upon revenue sharing relationships.

86.     Plan fiduciaries may do this to conceal the true amount of compensation paid to the recordkeeper or to reduce the plan sponsor's cost at the expense of plan participants.

87.     All of the JP Morgan SmartRetirement funds and a handful of other funds in the Plans share revenue with Fidelity.

88.     In determining whether a plan administrator or other fiduciary has fulfilled its obligation to ensure that the fees and expenses assessed against the plan are reasonable and incurred solely in the interest of plan participants, all sources of compensation, including revenue sharing, must be taken into account.

## CLASS ACTION ALLEGATIONS

89.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of herself and the following proposed class ("Class"):

> All persons, except Defendants and their immediate family members, who were participants in or beneficiaries of the Plan, at any time between six years before the filing of this lawsuit through the date of judgment (the "Class Period").

90.    The members of the Class are so numerous that joinder of all members is impractical. The 2020 Form 5500 for the 403(b) Plan lists 16,483 participants at the beginning of the plan year. The 2020 Form 5500 for the 401(k) Plan lists 14,956 participants at the beginning of the plan year. Thus, the putative class exceeds 31,000 individuals.

91.    Plaintiff's claims are typical of the claims of the members of the Class. Like other Class members, Plaintiff participated in the Plans and has suffered injuries as a result of Defendants' mismanagement of the Plans. Defendants treated Plaintiff consistently with other Class members and managed the Plans as a single entity. Plaintiff's claims and the claims of all Class members arise out of the same conduct, policies, and practices of Defendants as alleged herein, and all members of the Class have been similarly affected by Defendants' wrongful conduct.

92.    There are questions of law and fact common to the Class, and these questions predominate over questions affecting only individual Class members. Common legal and factual questions include, but are not limited to:

A.    Whether Defendants are/were fiduciaries of the Plan;

B.    Whether Defendants breached their fiduciary duties of loyalty and prudence by engaging in the conduct described herein;

C.    The proper form of equitable and injunctive relief; and

D.    The proper measure of monetary relief.

93.    Plaintiff will fairly and adequately represent the Class and have retained counsel experienced and competent in the prosecution of ERISA and class action

litigation. Plaintiff has no interests antagonistic to those of other members of the Class. Plaintiff is committed to the vigorous prosecution of this action and anticipate no difficulty in the management of this litigation as a class action.

94.    This action may be properly certified under Rule 23(b)(1). Class action status in this action is warranted under Rule 23(b)(1)(A) because prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants. Class action status is also warranted under Rule 23(b)(1)(B) because prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class that, as a practical matter, would be dispositive of the interests of other members not parties to this action, or that would substantially impair or impede their ability to protect their interests.

95.    Additionally, or in the alternative, certification under Rule 23(b)(2) is warranted because the Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

## CLAIM FOR RELIEF

### Breaches of Fiduciary Duties of Loyalty and Prudence

96.    Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

97.    At all relevant times, CentraCare and/or the Board Defendants and its members during the Class Period were fiduciaries of the Plan within the meaning of

ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plans' assets.

98.     As fiduciaries of the Plans, these Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a).  These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plans' participants and beneficiaries, and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

99.     Defendants breached these fiduciary duties in multiple respects as discussed throughout this Complaint. They did not make decisions regarding the Plans' investment lineup based solely on the merits of each investment and what was in the best interest of the Plans' participants. Instead, Defendants selected and retained investment options in the Plan despite the high cost of the funds in relation to other comparable investments. Defendants also failed to investigate the availability of lower-cost share classes of certain mutual funds in the Plan and to use those lower-cost share classes in the Plan.

100.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plans suffered millions of dollars of losses due to excessive costs and lower net investment returns.

101.    Had Defendants complied with their fiduciary obligations, the Plans would not have suffered these losses, and the Plans' participants would have had more money available to them for their retirement.

102.    Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plans all losses caused by their breaches of fiduciary duties and must also restore any profits resulting from such breaches.  In addition, Plaintiff is entitled to equitable relief and other appropriate relief for Defendants' breaches as set forth in their Prayer for Relief.

103.    Defendants knowingly participated in each breach of the other Defendants, knowing that such acts were a breach, enabled the other Defendants to commit breaches by failing to lawfully discharge such Defendant's own duties, and knew of the breaches by the other Defendants and failed to make any reasonable and timely effort under the circumstances to remedy the breaches.  Accordingly, each Defendant is also liable for the breaches of its co-fiduciaries under 29 U.S.C. § 1105(a).

## PRAYER FOR RELIEF

Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court awards the following relief:

104.    A determination that this action may proceed as a class action under Rule 23(b)(1) and Rule 23(b)(2) of the Federal Rules of Civil Procedure;

105.    Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

106.     A Declaration that the Defendants, and each of them, have breached their fiduciary duties under ERISA;

107.     An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, and to restore to the Plan all profits the Defendants made through use of the Plan's assets, and to restore to the Plan all profits which the participants would have made if the Defendants had fulfilled their fiduciary obligations;

108.     An order requiring the Company Defendants to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against the Company Defendant as necessary to effectuate said relief, and to prevent the Company Defendant's unjust enrichment;

109.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

110.     An order enjoining Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

111.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan's fiduciaries deemed to have breached their fiduciary duties;

112.     An award of pre-judgment interest;

113.    An award of costs pursuant to 29 U.S.C. § 1132(g);

114.    An award of attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common

fund doctrine; and

115.    Such other and further relief as the Court deems equitable and just.

Dated: June 13, 2022.                    Baillon Thome Jozwiak & Wanta LLP

                                         s/ Shawn J. Wanta
                                         Shawn J. Wanta
                                         Bar No. 0389164
                                         Scott A. Moriarity
                                         Bar No. 0321977
                                         Katherine E. Rollins
                                         Bar No. 0402808
                                         *Attorneys for Plaintiff*
                                         BAILLON THOME JOZWIAK & WANTA LLP
                                         100 South Fifth Street, Suite 1200
                                         Minneapolis, MN 55402
                                         Telephone: (612) 252-3570
                                         sjwanta@baillonthome.com
                                         samoriarity@baillonthome.com
                                         kerollins@baillonthome.com